U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 SEP -1 AM 11: 20

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

NORMAN WILLIAMS AND DIANE )
HOWE, AS LEGAL REPRESENTATIVES )
OF J.H., JAMEL BLAKELY, and )
KEVIN ATTAWAY, )
)
Plaintiffs, )
)
v. ) Case No. 2:17-cv-6
)
ROMARM S.A., )
)
Defendant. )

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS
(Doc. 77)

Plaintiffs, Norman Williams and Diane Howe, as legal representatives of J.H.; Jamel Blakely; and Kevin Attaway, bring this action against Defendant Romarm S.A. seeking relief pursuant to the District of Columbia Assault Weapons Manufacturing Strict Liability Act ("SLA"), D.C. Code § 7-2551. Plaintiffs initially filed in Maryland state court, and Defendant removed the action to the District of Maryland. On January 9, 2017, the Honorable Theodore D. Chuang granted Plaintiffs' motion to transfer the action to this court pursuant to 28 U.S.C. § 1406.

Pending before the court is Defendant's motion to dismiss (Doc. 77) pursuant to Fed. R. Civ. P. 12(b)(1)-(6) for lack of subject-matter jurisdiction, lack of personal jurisdiction, improper venue, insufficient service of process, and failure to state a claim. Following oral argument on July 17, 2017, the court took the motion under advisement.

Plaintiffs are represented by Daniel M. Wemhoff, Esq. and Kevin A. Lumpkin, Esq. Defendant is represented by Andrew D. Manitsky, Esq., Anthony M. Pisciotti, Esq., James W. Porter, III, Esq., Jeffrey M. Malsch, Esq., and John Parker Sweeney, Esq.

## I. The Amended Complaint.

The following facts are derived from Plaintiffs' Amended Complaint. Plaintiffs Williams and Howe are the legal representatives of J.H., who was shot and killed in the District of Columbia on March 22, 2010. Plaintiffs Blakely and Attaway sustained gunshot wounds in a related incident in the District of Columbia on March 30, 2010. Defendant is a firearm manufacturer and "an agency or instrumentality of the Romanian sovereign[.]" (Doc. 56 at 3, ¶ 7.) Defendant manufactured the firearm, a WASR-10 semi-automatic weapon, which was allegedly used to kill J.H. and injure Plaintiffs Blakely and Attaway (the "firearm").

The firearm was sold to Century Arms International, Inc. ("Century"), Defendant's exclusive distributor in the United States, and entered the United States through Century's facility in Vermont.[1] Defendant and Century have entered into a Business Promotion and Protection Agreement whereby Defendant agreed to manufacture and design its weapons so that Century can modify them to comply with domestic law. Plaintiffs allege that Century purchases over $5 million in firearms from Defendant annually.

In 2006, Century sold the firearm to a Federal Firearms License ("FFL") dealer in Ohio, which then sold it to a Maryland-based FFL.[2] Sometime in 2007, the Maryland-based FFL sold the firearm to an unidentified purchaser. Plaintiffs do not allege that these transfers were unlawful. After the firearm was sold in Maryland in 2007, it was

---

[1] Plaintiffs' Amended Complaint states that the firearm was sold to Century in 2008 but purchased in Maryland in 2007. They acknowledge that these allegations present a "discrepancy as to the timeline of the incident weapon[.]" (Doc. 56 at 2, ¶ 3.)

[2] While Plaintiffs' Amended Complaint alleges that the firearm was sold by Century to a Maryland FFL, Judge Chuang's September 30, 2016 Memorandum Order recites that Defendant has attached "records showing that the firearm was shipped from Romania to Century's Vermont location on November 22, 2006, and that Century then sold it on December 1, 2006 to an FFL located in Dayton, Ohio." (Doc. 61 at 4-5.) Plaintiffs "concede[d] in their Opposition that the firearm was not, in fact, sold from Century directly to a Maryland FFL[.]" *Id.* at 5. In adjudicating Defendant's motion to dismiss, Judge Chuang stated that "[a]lthough the firearm appears to have been received and sold by a Maryland FFL prior to the shootings, the evidence establishes that it was sold to the Maryland dealer not by Romarm or Century, but by an independent FFL in Ohio." *Id.* at 7.

2

allegedly used in March 2010 in the District of Columbia to kill J.H. and seriously injure Plaintiffs Blakely and Attaway.

## II. Procedural Background.

Plaintiffs Williams and Howe filed an action pursuant to the SLA against Defendant in the District of Columbia Superior Court in 2011, which Defendant subsequently removed to the United States District Court for the District of Columbia. Enacted in 1991, the SLA provides that:

> Any manufacturer, importer, or dealer of an assault weapon or machine gun shall be held strictly liable in tort, without regard to fault or proof of defect, for all direct and consequential damages that arise from bodily injury or death if the bodily injury or death proximately results from the discharge of the assault weapon or machine gun in the District of Columbia.

D.C. Code § 7-2551.02.

On March 20, 2012, in order to comply with the District of Columbia's newly enacted statute of limitations for wrongful death actions, Plaintiffs Williams and Howe re-filed a second action in federal court in the District of Columbia against Defendant and dismissed the action they had filed the previous year. On February 4, 2013, the district court dismissed the re-filed action on the grounds that the District of Columbia lacked personal jurisdiction over Defendant, and the United States Court of Appeals for the District of Columbia Circuit subsequently affirmed. *See Williams v. Romarm*, 187 F. Supp. 3d 63 (D.D.C. 2013), *aff'd*, 756 F.3d 777 (D.C. Cir. 2014).

Plaintiffs thereafter filed a third action in Maryland state court on September 2, 2014. Attorney Wemhoff attempted to effect service upon Defendant by mailing the complaint to Defendant's counsel, without seeking its consent to accept service in this manner. Defendant timely removed the action to the District of Maryland, which dismissed the action for lack of personal jurisdiction on July 20, 2015 and September 30, 2016. *See Williams v. Romarm S.A.*, 116 F. Supp. 3d 631 (D. Md. 2015); 2016 WL 5719717 (D. Md. Sept. 30, 2016). Although Defendant moved to dismiss on other grounds before the district courts in the District of Columbia and Maryland, Defendant's alternative grounds for dismissal were not adjudicated.

3

The case was thereafter transferred to this court. In granting Plaintiffs' motion to transfer, Judge Chuang concluded that Plaintiffs had made "a *prima facie* showing that Romarm is subject to personal jurisdiction in Vermont." (Doc. 67 at 2.)

On March 3, 2017, Defendant filed the instant motion. In addition to seeking dismissal on the grounds of lack of subject-matter jurisdiction, lack of personal jurisdiction, improper venue, insufficient service of process, and failure to state a claim, Defendant contends that Plaintiffs' action is time-barred and that the SLA violates the Commerce Clause and the Due Process Clause of the United States Constitution.

### III. Conclusions of Law and Analysis.

#### A. Standard of Review.

The Foreign Sovereign Immunities Act ("FSIA") constitutes "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). It provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided" by certain statutorily defined exceptions. 28 U.S.C. § 1604.

The FSIA "must be applied by the District Courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 (1983) (citation omitted). "If no exception applies, no U.S. court has jurisdiction to hear the claim." *Vera v. Republic of Cuba*, 2017 WL 3469204, at *4 (2d Cir. Aug. 14, 2017).

The FSIA defines a "foreign state" to include an "agency or instrumentality of a foreign state[.]" 28 U.S.C. § 1603(a). An "agency or instrumentality of a foreign state means any entity[:]"

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

*Id.* § 1603(b).

The parties do not dispute that Defendant, as an agency or instrumentality of Romania, qualifies as a "foreign state" within the meaning of the FSIA. *See* Doc. 56 at 3, ¶ 7 (alleging that Defendant is "determined to be an agency or instrumentality of the Romanian sovereign"). Defendant is thus presumptively immune from suit unless a statutory exception applies. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."). "The party seeking to establish jurisdiction bears the burden of producing evidence establishing that a specific exception to immunity applies, but the foreign state then bears the ultimate burden of persuasion on this question." *City of New York v. Permanent Mission of India to the U.N.*, 446 F.3d 365, 369 (2d Cir. 2006).

### B. Whether the "Commercial Activity" Exception Is Applicable.

"The single most important exception to foreign state immunity under the FSIA . . . is the commercial-activity exception." *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 106 (2d Cir. 2016) (citation and internal quotation marks omitted). This exception provides that a foreign state is not immune from suit "in any case" in which:

> the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2).

"A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall

5

be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d). "[W]hen a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992); *see also Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 704 (1976) ("In their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns. Instead, they exercise only those powers that can also be exercised by private citizens.").

Plaintiffs argue that Defendant is not immune from suit pursuant to the third clause of the "commercial activity" exception because they contend that Defendant, as manufacturer of the firearm, is strictly liable under the SLA for the death of J.H. and the injuries to Plaintiffs Blakely and Attaway. "The third clause of the commercial-activity exception is known as the 'direct-effect clause.'" *Atlantica Holdings*, 813 F.3d at 106. The direct-effect clause provides that a foreign state is not immune from suit if the plaintiff's "lawsuit is (1) based upon . . . an act outside the territory of the United States; (2) that was taken in connection with a commercial activity of [the foreign state] outside this country; and (3) that cause[d] a direct effect in the United States." *Id.* (quoting *Weltover*, 504 U.S. at 611) (internal quotation marks omitted).

"As a threshold step in assessing plaintiffs' reliance on the 'commercial activity' exception, [the court] must identify the act of the foreign sovereign State that serves as the basis for plaintiffs' claims." *Garb v. Republic of Poland*, 440 F.3d 579, 586 (2d Cir. 2006). Plaintiffs argue that Defendant's manufacture of the firearm constituted the "act" outside the territory of the United States which caused the "direct effect" of the death of J.H. and the injuries to Plaintiffs Blakely and Attaway in the District of Columbia.

For purposes of the FSIA, "an effect is direct if it follows as an immediate consequence of the defendant's activity." *Weltover*, 504 U.S. at 618 (internal quotation marks and alterations omitted). The Second Circuit has defined "immediate" to mean that "between the foreign state's commercial activity and the effect, there was no

6

'intervening element.'" *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 74 (2d Cir. 2010); *see also Martin v. Republic of S. Africa*, 836 F.2d 91, 95 (2d Cir. 1987) ("The common sense interpretation of a 'direct effect' is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption."). "[T]he mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States." *Guirlando*, 602 F.3d at 78.

In this case, after Defendant manufactured the firearm, it was sold to Century in 2006 and then transferred on three occasions over the following year, through the States of Vermont, Ohio, and Maryland before entering the District of Columbia. Thereafter the firearm was used by a person or persons engaged in criminal activity to cause Plaintiffs' death or injuries.[3] Assessed against this backdrop, the court cannot conclude that the discharges of the firearm in the District of Columbia in 2010 were the "immediate consequences[,]" *Weltover*, 504 U.S. at 618, of its manufacture in 1970 by Defendant in Romania or its retrofitting in Vermont in 2006. Rather, the direct effects constituting Plaintiff's harm "fall[] at the end of a long chain of causation and [are] mediated by numerous actions by third parties" and thus reflect a "tangled causal web [that] does not provide the requisite immediacy to establish jurisdiction." *Virtual Countries, Inc. v. Republic of S. Africa*, 300 F.3d 230, 237-38 (2d Cir. 2002). The tragic death of J.H. and the injuries sustained by Plaintiffs Blakely and Attaway "depended crucially on variables independent of" Defendant's manufacture of the firearm, including the criminal acts of individuals acting wholly independent of Defendant. *Id.* at 238. These multiple "intervening element[s,]" *Guirlando*, 602 F.3d at 74, render the direct-effect clause of the "commercial activity" exception inapplicable. The Supreme Court has "reject[ed] the

---

[3] Plaintiffs do not allege that the firearm was defective or that the death of J.H. or injuries to Plaintiffs Blakely and Attaway were caused by an alleged defect. *See Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 113 (2d Cir. 2016) (stating that "courts have consistently held that the direct-effect clause is satisfied by allegations that a plaintiff was injured in the United States by a faulty product manufactured by the defendant abroad").

suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Weltover*, 504 U.S. at 618.

Finally, extending the direct-effect clause to cover the "remote harm" alleged by Plaintiffs would not "further the [FSIA's] purposes." *Virtual Countries, Inc.*, 300 F.3d at 238. The Second Circuit has stated that "[t]he boundaries of the statutory exceptions to sovereign immunity, including the 'direct effect' exception construed in *Weltover*, must be carefully patrolled to preserve the FSIA's 'general rule of immunity.'" *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 411 (2d Cir. 2014) (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013)).

> Defining "direct effect" to permit jurisdiction when a foreign state's actions precipitate reactions by third parties, which reactions then have an impact on a plaintiff, would foster uncertainty in both foreign states and private counter-parties. Neither could predict when an action would create jurisdiction, which would hinge on third parties' independent reactions and conduct, even if in individual cases, such as the one at bar, a particular effect might be foreseeable. To permit jurisdiction in such cases would thus be contrary to the predictability interest fostered by the statute.

*Virtual Countries, Inc.*, 300 F.3d at 238.

Because Plaintiffs do not allege a "direct effect" in the United States caused by Defendant's act, the direct-effect clause of the "commercial activity" exception does not apply and Defendant's foreign sovereign immunity precludes the court's exercise of jurisdiction. *See, e.g., Pons v. People's Republic of China*, 666 F. Supp. 2d 406, 414 (S.D.N.Y. 2009) (holding that "plaintiffs have not shown a direct effect in the United States sufficient for the FSIA commercial activity exception" and that FSIA therefore did "not permit this court to exercise jurisdiction over the" defendant). On this basis alone, the court lacks subject-matter jurisdiction to adjudicate this dispute.

Even if Plaintiffs could allege a "direct effect" in the United States, they must also allege that their action is "based upon" Defendant's act outside the United States. As the Second Circuit has explained:

> [I]n order to find jurisdiction under the third clause of § 1605(a)(2) of the FSIA, it is not enough to find that the defendant committed some act "in connection with a commercial activity of the foreign state elsewhere and

that act cause[d] a direct effect in the United States." We must also find the plaintiff's suit in U.S. courts is "based upon" that act.

*Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 389 (2d Cir. 2000).

The FSIA does not define the phrase "based upon." *See Nelson*, 507 U.S. at 357 (observing that the FSIA "contains no definition of the phrase 'based upon,' and the relatively sparse legislative history offers no assistance"). However, the Supreme Court has held that "[r]ather than individually analyzing each . . . cause[] of action," the court must "zero[] in on the core of the[] suit" and identify the "'particular conduct' that constitutes the 'gravamen' of the suit[.]" *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015) (quoting *Nelson*, 507 U.S. at 358). The court must then evaluate the "degree of closeness . . . between the commercial activity and the gravamen of the plaintiff's complaint" to determine whether the action is "based upon" the defendant's commercial activity. *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 156 (2d Cir. 2007).

In this case, the "gravamen" of Plaintiffs' claims is the tortious and illegal discharge of the firearm in March 2010 that caused their harm. *See* Doc. 56 at 7, ¶¶ 25-26 (requesting damages pursuant to the SLA, the District of Columbia Survival Act, D.C. Code § 12-101, and for "the common law tort of emotional distress" and for their "permanent injuries"). The torts and criminal acts committed by unknown third parties, "and not the arguably commercial activities that preceded their commission, form the basis for [Plaintiffs'] suit." *Nelson*, 507 U.S. at 358. Under such circumstances, the "degree of closeness" required by the FSIA is lacking. The Second Circuit has held that the "degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction . . . is *considerably greater than common law causation requirements*." *Transatlantic*, 204 F.3d at 390 (citing *Nelson*, 507 U.S. at 357) (emphasis supplied). While Plaintiffs may be able to establish "but for" causation, no reasonable view of the facts would render Defendant's manufacture of the firearm the proximate cause of their injuries. The SLA tacitly recognizes this by purporting to impose strict liability without "fault or proof of defect." D.C. Code § 7-2551.02. However, as the

9

FSIA is "the sole basis for obtaining jurisdiction over" Defendant, *Amerada Hess*, 488 U.S. at 434, the SLA's sweeping embrace cannot confer subject-matter jurisdiction in contravention of the plain language of the FSIA.

Because Plaintiffs' Amended Complaint is not "based upon" Defendant's conduct within the meaning of the FSIA, the direct-effect clause of the "commercial activity" exception does not apply and Defendant's motion to dismiss must be GRANTED.

Having concluded that it lacks subject-matter jurisdiction to adjudicate this dispute, the court declines to address Defendant's alternative grounds for dismissal. *See Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) ("Where, as here, the defendant moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined.") (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the court hereby GRANTS Defendant's motion to dismiss (Doc. 77). Plaintiffs' Amended Complaint is DISMISSED WITHOUT PREJUDICE. *See Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 139 (2d Cir. 1999) (concluding that "where a court lacks subject matter jurisdiction, it also lacks the power to dismiss with prejudice").

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 1st day of September, 2017.

Christina Reiss, Chief Judge
United States District Court